# NEW YORK SUPERIOR COURT.

## MYRON H. STRONG, appellant agt. JAMES K. PLACE and another, respondents.

Where the only evidence before a referee, to sustain his findings of fact and conclusions of law thereon, is conflicting, and of *equal weight*, or rather with no circumstances to detract from the weight of, or corroborate that on either side, and where the determination of the facts in issue either way, must depend upon *who has the affirmative*, the court has a right to infer that the ultimate finding, if not in favor of the party having the negative, was based on a wrong rule of evidence.

Where the finding of a referee, that the *contract* upon which the action is founded, was *conditional*, is not borne out by the evidence, and if the report is only sustainable upon that ground, the court will set it aside.

The foundation of the plaintiff's cause of action, as set out in the complaint, consisted of a promise by the defendants to pay his assignor one-half of their profits in buying and selling certain articles of merchandize (spices) ; and alleged the consideration to have been an agreement by the plaintiff's assignor to provide them " with what information he might obtain," respecting the probable action of the United States congress " in regard to duties on *spices*, and advise them respecting the probable future condition of the market resulting therefrom," claiming such agreement as one for a co-partnership, and for an accounting.

The answer admitted the making of a *conditional* promise by the defendants to pay the plaintiff's assignor three-eighths of the profits of their dealings in spices, if certain representations previously made by him were true (stating such representations). The answer averring that the payment of such net profit was " a compensation to him for imparting his said knowledge to the defendants :" That the information so given by him, and all such statements and representations were untrue at the time he made them ; and he knew them to be untrue at the time he made them ; and made them fraudulently, to procure money from the defendants.

The referee found that the promise of the defendants was a *conditional* one, as alleged in the answer. And also found as a fact, that the representations made by the plaintiff's assignor were untrue :

*Held*, that the arrangement between the parties was evidently not a *co-partnership* as between themselves, as by it the plaintiff's assignor acquired no interest in the goods bought ; was not liable for any losses ; and only received a part of the net profits as compensation for information, either then communicated or to be afterwards communicated :

*Held*, also, that the mere addition of the *condition* set forth in the answer to the promise of the defendants, would not defeat the plaintiff's right to recover under the complaint, although it might impose upon him the necessity of establishing in advance the truth of the representations made by the plaintiff's assignor. It would, however, be repugnant to any averment, that the promise was made in the faith of the truth of such representations :

*Held*, that it is illegal to predicate fraud in making a contract, of one by

whose very terms the truth of the matter alleged as a deceit, is made a condition of its obligation.

Where a conditional contract rests in *fieri*, and nothing has been done or is to be done under it, until its final performance, and a question arises as to its obligatory character, proof of fraud seems superfluous, until the occurrence of the contingency constituting the condition is established:

*Held*, also, that the proof of the affirmative, establishing the statements alleged in the answer, rested with the defendants, as such statements formed no qualification or part of the contract, but were extrinsic matter forming part of the elements by which it might be defeated if it were established:

*Held*, also, that the referee was misled, by not keeping in view, in reference to the burden of proof, the distinction between evidence relating to the terms of the contract itself, and that relating to extrinsic matters affecting it, such as the making and falsity of the representations in question:

*Held*, also, that the plaintiff ought not to be deprived of whatever rights he has, under the promise of the defendants to pay his assignor a proportion of the profits, merely upon such evidence as that before the court, of untrue representations made to obtain such promise.

*General Term, October,* 1866.
*Heard October,* 1866. *Decided March,* 1867.
*Before* ROBERTSON, *Ch. J.,* MONELL *and* McCUNN, *Justices.*

T. B. ELDRIDGE *and* F. J. FITHIAN, *for the appellant.*
L. R. MARSH, *for the respondents.*

*By the court,* ROBERTSON, Ch. J. The foundation of the cause of action of the plaintiff, as set out in the complaint, consists of a promise by the defendants to pay his assignor (Mr. Griffith) one-half of their profits in buying and selling certain articles of merchandize (spices). It alleges the consideration to have been an agreement by Griffith to provide them " with *what information he might obtain*" respecting the probable action of the United States congress " in regard to duties on spices, and advise them respecting the *probable future condition* of the market resulting therefrom." It demands an accounting for such profits, claiming that such agreement was one for a co-partnership.

The answer puts in issue the making of such agreement, or any similar one, except as thereinafter stated. It admits the making of a *conditional* promise by them to pay Griffith three-eighths of the profits of their dealings in spices, *if certain representations previously made by him were true.* Those representations were, that at the time of making them

(February 17, 1864), he (Griffith) had "*positive knowledge* that the committee of ways and means of the house of representatives of the United States, was considering a bill imposing duties upon goods imported into such United States, and *had adopted a rate of duties* to be imposed *upon imported spices,*" and also of "what *that rate was,* and that it *was very large.* That he was the only party, outside of such committee, who possessed such knowledge." And again, "that he positively knew that such committee had agreed to recommend to the house of representatives the passage of a law, fixing the duties or taxes upon imported spices," at certain rates on each article, which he enumerated. It alleges, that before making such promise, Griffith proposed to the defendants to impart his such knowledge to them, if they would agree to give him "*as a compensation to him for imparting such knowledge to them,*" one-half of the net profits they should make upon certain spices which he named, purchased by them "after receiving such knowledge, and before such committee should report, and its action otherwise become public." And that the defendants, in answer to such proposal, requested him to state "what duties such committee proposed to put upon spices, and assented to entering into *some* arrangement" with him upon the subject of such proposed enhancement, if duties upon spices "*made it an object.*" Upon which, he made the statement before mentioned, of the amount of the several duties. Such answer also avers, that the payment of such net profit was "a compensation to him, *for imparting* his said knowledge to the defendants."

The answer further alleges, that the defendants entered into such agreement, believing such statements and representations of Griffith to be true, and upon the faith thereof. That the information so given by him, and all such statements and representations, were untrue at the time he made them, and he knew the same to be untrue at that time, and made the same fraudulently, to procure money from the defendants. It also negatives the statements contained in

such representations, and states some facts inconsistent with their truth.

The pleadings do not, therefore, differ in their statement of the fact of a promise by the defendants to pay the plaintiffs' assignor a portion of their net profits upon certain articles of merchandize, but only in the proportion. They do differ, both as to the consideration or motive of making such a promise, and the absolute or qualified nature of the promise. The complaint alleges the consideration to have been the future collection of information by Griffith; the answer, the communication of information then possessed by him. The promise in the complaint is absolute and unqualified; that in the answer is conditional, and made to depend upon the truth of representations made. The answer, however, sets up in addition, fraud in obtaining such promise, whereby it is avoided.

The arrangement between the parties was evidently not a co-partnership as between themselves, since by it Griffith acquired no interest in the goods bought; was not liable for any losses; and only received a part of the net profits as compensation for information, either then communicated, or to be afterwards communicated. The variance between the shares of the profits promised, as set out in the complaint and answer, was not material; as whichever was correct, the plaintiff was entitled to recover, if there were no other objections.

The mere addition of the condition set forth in the answer, to the promise of the defendants, would not defeat the plaintiff's right to recover, under the complaint, although it might impose upon him the necessity of establishing in advance the truth of Griffith's representations. It would, however, be repugnant to any averment, that the promise was made in the faith of the truth of such representations. Being made part of the contract in which all prior negotiations are merged, covering precisely the same ground as such representations, it is more effectual in its protection of the rights of the defendants, and forms a stronger barrier against fraud, than even rescinding the contract on such ground; and as

it throws upon the promisee the burden of proving the truth of his representations, and renders it unnecessary for the promissor to show guilty knowledge on the part of the former, it must render proof of fraud immaterial. It is, indeed, illogical to predicate fraud in making a contract, of one by whose very terms the truth of the matter alleged as a deceit, is made a condition of its obligation. Possibly, where some damages have ensued from acts done under such a contract, fraud may be given in evidence to enhance them ; but where a conditional contract rests in *fieri*, and nothing has been done or is to be done under it, until its final performance, and a question arises as to its obligatory character, proof of fraud seems superfluous, until the occurrence of the contingency constituting the condition, is established.

These considerations press themselves upon us, because the promise made by the defendants is found in the report of the referee to have been a conditional one, precisely as alleged in the answer, and following its very words. As such report also finds as a fact that the representations, on whose truth the obligation of such contract was thus made to depend, were untrue, any evidence of such conditional contract would end every question as to such report; for the referee must be held to have pronounced his judgment upon the supposition of the making of such conditional contract, unless there be something in his report to show the contrary. But I have looked in vain through the evidence, for any proof as to the attachment of such a condition to the obligation of the contract, although there was some of a similar one to its making. The defendant James K. Place, who alone made the contract, does not state that any such condition was attached. He simply states, that after Griffith had made his statements, and communicated all his information, and the proportion of profits to be given as compensation for such information was fixed, he, himself, said, they, the defendants, " would agree to it ;" adding no qualification thereto. On his cross-examination, he stated substantially the same thing, only adding, " if the information was *of value*." The finding, therefore, that the contract was con-

ditional, is not borne out by the evidence, and if the report is only sustainable on that basis, it should be set aside.

But if the attachment of a condition to the contract is to be disregarded, or proof of fraudulent misrepresentations be equally admissible and available to avoid it, whether such condition had not or had been attached, as the learned referee seems to have assumed, since he rests his decision on only one conclusion of law, to wit, that such misrepresentations avoided the contract, it becomes necessary to look at the evidence of the making of such statements as are alleged in the answer. Upon that point it cannot be questioned, that by well settled laws of evidence, the proof of the affirmative rests on the defendants, as such statements formed no qualification or part of the contract, but were extrinsic matter, forming part of the elements by which it might be defeated, if they were established. And I cannot but think that the learned referee suffered himself to be misled on that point, and did not keep in view, in reference to the burden of proof, the distinction between evidence relating to the terms of the contract itself, and that relating to extrinsic matters affecting it, such as the making and falsity of the representations in question. In the opinion accompanying his report, he commences by assuming that, "if the conversation (between the defendants and plaintiff's assignor) was such as the defendants say it was, no such contract was made as was set out in the complaint; and * * * the contract actually made, was made void by reason of the representations made by Griffith being untrue." But, as I have already shown, so far as the plaintiff's cause of action was concerned, the promise of the defendants, as stated by both parties, unless the amount and condition referred to, be taken into consideration, was substantially the same. If in the term "contract," the learned referee included the promise of Griffith, set forth in the complaint, to procure information, of course that was not the same, but that did not take away the plaintiff's right to recover. The referee then proceeds to lay down, as a principle, "that unless there be something in the residue of the testimony tending strongly

to corroborate Mr. Griffith, and to discredit the accuracy of the defendants' recollections, or their honesty as witnesses, in the action, the plaintiff has *failed to establish* the cause of action stated in the complaint. *The burden of proof is on the plaintiff to establish his case.* This cannot be said to have been done in the case, unless upon a fair view of the whole evidence, *there is a clear preponderence in favor* of the plaintiff." This evidently implies that the plaintiff must *disprove by preponderating evidence, the making of the representations,* and the subsequent part of the opinion fully corroborates this view. For after analyzing the testimony of the two defendants, and their brother (Charles Place), the referee examines the questions whether their acts, or the other testimony in the case, or both,. "tend so strongly to discredit their memory, or honesty as witnesses, that the *plaintiff's testimony should be accepted as accurate,* and the defendants treated as erroneous." He concedes that both parties in testifying, believed the truth of what they stated. After weighing probabilities of the truth of the statements of the parties, he considers the testimony of the defendants as reconcilable, and concludes that it ought not to be discredited. Although he "*saw nothing* in the conduct of Griffith, as a witness, to lead him *to suspect that he did not testify in good faith,*" he still considered his testimony incompatible with that of Mr. Charles Place, in reference to a contract not involved in this action. And the learned referee finally arrives at the conclusion that *no such contract* was made as that stated in the complaint, but only that stated in his findings of fact. From this synopsis of the course of reasoning of the referee, it is impossible to escape the conclusion that he considered either that it was indispensable for the plaintiff to establish the consideration stated by him for the promise of the defendants, as part of the contract, or that the representations mentioned in the answer, formed a part of it; and that the burden of the proof, or rather disproof, of having made them, lay with the plaintiff. Either principle was erroneous, for the reasons before assigned.

But it may be said that the legal results of the referee's

decision depend upon his findings of fact and conclusions of law, and cannot be controlled by his mere opinion, which forms no part of the record; that his report must be sustained, if upon any facts of which there is any evidence, and the application of any correct rules of law to them, the defendants were entitled to judgment. Such a rule would be difficult of application, where a mere erroneous rule of evidence had been adopted, without any error as to the legal rights of the parties. Possibly, there may be some mode of procuring the insertion of the rule of evidence so adopted among the conclusions of law. But, in any event, where the only evidence is conflicting and of equal weight, or rather with no circumstances to detract from the weight of or corroborate that on either side, and where the determination of the facts in issue either way must depend upon *who has the affirmative*, the court has a right to infer that the ultimate finding, if not in favor of the party having the negative, was based on a wrong rule of evidence.

The defendant (James K. Place) was the person with whom the plaintiff's assignor made whatever agreement was made, and the only person who testifies to the representations, upon the faith of which it is alleged it was made. His brothers, the other defendant (E. B. Place) and Charles Place, testified to similar representations at or about the same time, and such testimony seems to have been referred to in order to corroborate his. The testimony of Mr. Charles Place, as to representations to him on which he made a contract with such assignor, with whose terms he complied, was at first excluded by the referee, in consequence of an objection by the plaintiff's counsel, but was ultimately admitted by their consent. This admission by consent, however, will not of course make it relevant as evidence upon issues which it would otherwise be irrelevant; and, at most, only waives the exception. The learned referee seems to have considered it available not only to corroborate the testimony of the defendants as to similar representations made to them, or impugn the veracity or memory of Griffith, by contradicting a statement by him on his cross-examination that he had

never made such statement to Charles Place. Its availability for either purpose depends entirely upon its admissibility as a corroboration of the defendants' statement, otherwise it was on a collateral subject, and the answer of Griffith must be received as conclusive. Such transaction with Charles Place was *not* established to have been *fraudulent*, even if the representations were precisely the same. It related to other articles, a share in the profits on one of which (sardines), was paid by Place to Griffith, without a demur. Even if it had been fraudulent, I am not aware that the rule of evidence which admits cotemporaneous similar acts as evidence of fraudulent intent (*Cary* agt. *Hotaling*, 1 *Hill*, 311; *Hall* agt. *Naylor*, 18 *N. Y. R.* 588; *French* agt. *White*, 5 *Duer*, 254) has ever been extended to making similar contracts, evidence of similar misrepresentation, since it is only to the question of intent therein, after proof of their being made *aliunde* has been adduced, it is applicable. And if not admissible as corroborate evidence, the question put to Griffith, on his cross-examination, as to making such statements to Charles Place, was merely as to collateral matter, and not as if it had been as to admissions made by him of his representations made to the defendants. His answers were therefore conclusive. Besides, the credibility of both witnesses was equally balanced.

The testimony of the defendant, Ephraim B. Place, shows that no contract was made while he was present. His interview with Griffith, in which the latter (according to his statement) disclosed all the details of the information he professed to have, ended in the defendants merely referring him to his brother. Such representations evidently formed no inducement to the contract, as the witness said he *never conferred with* his co-defendant respecting them, or heard him say there was a contract. He only knew that goods were bought under some contract with Griffith. The interview only lasted from five to ten minutes. After it, Griffith had no means left to secure a share of the profits by withholding his information, and had only obtained an expression of willingness to join in an arrangement, if his brother would con-

sent. This is hardly corroborative of an agreement made with another person next day, on the faith of representations then made and entered into, in consideration of the disclosure contained in such representations. So that, after all, the whole proof of the making of them rests on the testimony of Mr. James K. Place (the defendant).

The testimony of that defendant was that on the introduction to him of Griffith by his co-defendant, the· latter only stated that he (Griffith) had some knowledge in reference to the tariff, and wanted to make some arrangement with " them to impart what information he possessed for a consideration," which is somewhat inconsistent with the testimony of such other defendant, that he had already disclosed it all to him. I think it more just to this witness to take his statement of the subsequent conversation at such interview from his cross-examination, which, being given after his ˙memory was revived as to the circumstances, was more orderly, coherent, certain and complete than that given on his direct. The fact and nature of any representations by Griffith was only drawn out on such direct examination by very suggestive questions on the part of the counsel ˙for the defendants. There was also some uncertainty in it, as he could not recollect whether the first question put by himself to Griffith was what he proposed? or what share of the profits he would want? and whether Griffith had told him that ˙the committee ˙had decided what to report, *before* he offered to leave the rate of his compensation to the witness: or whether he asked Griffith, after such offer, *what the rate of the tariff would be?* The following is the testimony of the witness, on his cross-examination, in answer to an inquiry as to the substance of the language used by Griffith on making the contract: " Mr. Griffith stated that the committee on ways and means of the house ˙of representatives, or in general terms, *that congress* would place a large duty on certain goods, something in our line, and *that he had access to the committee* by friends in Washington, *by·whom he was then possessed of important information* which would have a bearing on the value of those goods; the duty would be very large, very

heavy, on many articles; he would like to make an arrangement to participate in the profits of goods purchased on the basis of that information; I asked him *if that was information that he had already in his possession,* and he stated it was what he was talking about; I told him I did not see any objection to it, provided *the information was of value;* I asked him what proportion of the profits he would want on such goods as we purchased, and he said one-half; I told him I thought that was a large proportion to let him have, not advancing the money, and thought that a less proportion—three-eighths—would be fair; without very much conversation about it, *he acquiesced in that;* perhaps we argued that point a little, not much; I told him we would treat him fairly in the matter, and *asked him what the information was he possessed; he told me that the committee of ways and means had agreed upon the tariff on these five article*s, *and he gave me the figures I have stated.*"

He further stated, that he did not remember that anything else of importance was said, except as to articles in which they did not deal. He also added, there was nothing said about the amount of goods he was to buy. In such statement no mention is made at what period of the interview the defendants acceded to the proposition upon the terms as adjusted. But that is supplied by the direct examination of the same witness, where it appears to have been withheld until after Griffith had disclosed the name and position of his informant. This corresponds with the answer of the defendants, where they make their promise to pay the result of a previous disclosure by Griffith of all he knew, and its performance, a compensation therefor. This would deprive such promise of any legal consideration, and make it entirely gratuitous.

I do not, however, discover, in any of the testimony of J. K. Place, any statement that Griffith ever said, as alleged in the answer, and found by the report of the referee, that he "*positively knew*" that the committee in question "*had agreed to recommend* to the house of representatives the passage of a law increasing" the rate of duties upon the designated articles.

His statement was that such committee, or, "*in general terms,* congress would place *a large duty*" on them, which was merely prophetic, conjectural or promissory, and did not assert an existing fact or past occurrence, and he immediately not only stated his knowledge to be on information, but gave the name and position of his informant: being (as J. K. Place testified on his direct examination) the president's private secretary and also secretary of such committee. Griffith plainly asserted nothing of his own knowledge, but that everything stated by him was on information, whose reliability was placed upon the position and means of knowledge of his informant. The defendants were not content to rely simply on his statement of the mere fact represented, but demanded the source of his information on which they evidently most relied, as they inquired of a witness (Hussey) whether it was reliable. The representation, therefore, if any, on the faith of which they made their promise, was the communication of such information from the secretary of such committee (Stoddard), and not the resolution of the committee itself. All that was stated by Griffith would have been true, if such secretary had made such communication to him, and there is nothing in the case to disprove it, whatever had been the act or omission of the committee. Yet no such issue was made or tried, but one, which went straight to the conduct of the committee, without regard to Griffith's means of information. Upon the issue actually made and tried, evidence that the secretary *had so informed Griffith* would have been immaterial, even on the question of fraudulent intent, because it was *personal knowledge* that was at issue, not merely a reasonable ground of belief. The finding of the referee, therefore, that Griffith had *no reason to believe* the representations made by him were true, or that he had not been informed that the committee in question had agreed to recommend the passage of a law fixing the rate of duties on imported spices at the prices stated by him, was immaterial, and unsupported by anything, unless the mere absence of evidence be sufficient. In fine, there was no affirmative evidence sustaining the

allegations in the answer as to the character of the repre-
sentations (if any) made to the defendants, to induce them
to make the promise sued upon.

But, even if all the allegations in the answer as to such
representations had been positively testified to by the
defendant (James K. Place, besides their positive denial by
Griffith upon the stand (which would have required a find-
ing against them, for want of a ·preponderance of evidence
in their favor), there are one or two circumstances which
detract from the reliability of Mr. Place's statement.  On
the 9th of March, about three weeks after the making of
such contract, and some days before the last purchase under
it was made, the very secretary, as to whose statements such
representations related, wrote in a letter to Griffith : " The
committee have not fixed their figures *absolutely and irre-
vocably* upon any article, but have *discussed* the subject of
teas and *spices* freely.  The have *decided* that those articles
*must and shall stand a very large additional tax.*"  That part
of such letter Griffith testified positively that he read, about
the time he received it, to the defendant, James K. Place,
while the latter was only able to state he could *not remember*
whether he had ever done so or not.  So, too, the same
secretary wrote to the plaintiff, then engaged in procuring
information for Griffith, in a letter to him dated March 21,
1864 (which was after the last purchase) : " You demand
points and *figures on articles to which no allusion* has yet
been made *by the committee* of ways and means.  Tell your
men not to be discouraged ; they shall have all the points as
fast as they are made in the committee.  *   *   Tell them
*they can't have the figures* till the committee *fix* them, or come
so near it that I feel safe in giving them the points."
Griffith testifies that he also read this letter to the same
defendant, which the latter does not deny, but says he can-
not recollect it.  In such a case, other things being equal,
the positive recollection must prevail.  And, although such
letter to the plaintiff does not allude to *spices*, yet it should
have excited the defendant to inquire what it referred to in
which he was interested, particularly succeeding, as it did,

the other letter to Griffith. But such letter to the latter, of the, 9th of March, plainly showed that the committee had not resolved on anything definite ; and if Griffith had made different representations, its reading ought not only to have made some impression on the memory of such defendant, but have induced him, at the time, to charge Griffith with duplicity, notify him of a rescission of the contract for fraud, and discontinue all operations under it. The fact that he did neither, goes far to show that such positive statements as he testified to were never made. The learned referee, feeling the force of this view, urges, in his opinion, in reply, that there was no certain evidence, when Griffith received the letter of the 9th of March, what part of it he read to the defendant, and when ; that he did not pretend to know when he received it ; that there was no entry on it of the time of its receipt ; that he did not allow the defendants to read it, and only read such parts of it as he saw fit; and that he made no entry on it of the parts he read. As to the not permitting the defendants to read it, it appears that it contained allusions to other matters, and the hearing it read was as good notice of its contents as if it had been read by the defendants. As to the time of the receipt of the letter, its reading, and the parts read, the testimony of Griffith, which is the only evidence on those subjects, was in substance as follows : That he received such letter in due course of mail, and showed it at once to the defendant; he made it a point always to do so; and read it to him on the day he received it; and that he read all contained therein that related to the duties on spices, there being other matters therein ; and that such was his habit. It appears to me that, allowing two days for receiving the letter from Washington, there was sufficient evidence of all the important part of it having been communicated to the defendants before the 14th of March, when the last purchase was made. But whenever received or read, it should have awakened the indignation of the defendants at the fraud attempted to be perpetrated, and have induced them forthwith to have notified Griffith of a rescission of the contract. But they

went on, and sold the spices which they had bought, as they state, relying upon such information, making large profits, and never notified Griffith that the contract was at an end, until his assignee (the plaintiff) was refused, when he made a demand to their counsel, without a word of explanation.

Some plausibility, if not probability, is given to Griffith's statement of what passed in making the contract, by the evidence of his receipt of similar information from Stodard, through the plaintiff; the continuance of the plaintiff's efforts to procure further information, and his arrangements of the purpose, as well as the facilities possessed by those on whom he relied for getting information. While, on the other hand, allowance must be made for a possibly innocent exaggeration by him in his representations of the certainty of the result, which, in the memory of the defendants, disappointed in their expectations of a great gain, and unconscious of the precise foundation on which they rested, may, after the lapse of nearly two years, been converted into the supposition that it was the statement of an undeniable fact. The testimony of the parties might possibly have been reconciled on such a supposition. At all events, the plaintiff ought not to be deprived of whatever rights he has under the promise of the defendants to pay his assignor a proportion of their profits, merely upon such evidence as that before us of untrue representations made to obtain such promise. I have not deemed it advisable to consider the question of the illegality of the contract, as it does not appear what it was.

The judgment should be reversed, the order of reference annulled, and a new trial had, with costs to abide the event.